# UNITED STATES DISTRICT COURT
## DISTRICT OF CONNECTICUT

| | |
|---|---|
| VAN NATTA, et al.,<br>        Plaintiffs, | No. 3:18-cv-438 (SRU) |
|        v. | |
| GREAT LAKES REINSURANCE (UK)<br>SE,<br>        Defendant. | |

## <u>ORDER</u>

Steven Van Natta ("Steve") and his mother Liette Van Natta ("Liette") (together, the "Plaintiffs") sue Great Lakes Reinsurance (UK) SE, now known as Great Lakes Insurance SE ("Great Lakes"), for breach of an insurance contract (the "Policy").  Great Lakes has refused to provide insurance coverage for severe water and mold damage to the Plaintiffs' property, which Steve used as a second home.  After the damage, the Plaintiffs paid out-of-pocket to gut the property's interior, sold the property at a significant discount, and now seek damages for what the cost of reconstruction would have been (they did not actually perform the reconstruction).  Great Lakes moves for summary judgment based on two exclusions under the Policy and because the Plaintiffs' claim for damages is speculative.  For the reasons that follow, Great Lakes's motion for summary judgment, doc. no. 44, is **granted in substantial part and denied in part**.

## I.      Standard of Review

Summary judgment is appropriate when the record demonstrates that "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed.

R. Civ. P. 56(a); *see also Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 256–57 (1986) (plaintiff must present affirmative evidence to defeat a properly supported motion for summary judgment).

When ruling on a summary judgment motion, the court must construe the facts of record in the light most favorable to the nonmoving party and must resolve all ambiguities and draw all reasonable inferences against the moving party. *Anderson*, 477 U.S. at 255; *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986); *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 158–59 (1970); *see also Aldrich v. Randolph Cent. Sch. Dist.*, 963 F.2d 520, 523 (2d Cir. 1992) (court is required to "resolve all ambiguities and draw all inferences in favor of the nonmoving party"). When a motion for summary judgment is properly supported by documentary and testimonial evidence, however, the nonmoving party may not rest upon the mere allegations or denials of the pleadings but must present sufficient probative evidence to establish a genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 327 (1986); *Colon v. Coughlin*, 58 F.3d 865, 872 (2d Cir. 1995).

"Only when reasonable minds could not differ as to the import of the evidence is summary judgment proper." *Bryant v. Maffucci*, 923 F.2d 979, 982 (2d Cir. 1991); *see also Suburban Propane v. Proctor Gas, Inc.*, 953 F.2d 780, 788 (2d Cir. 1992). If the nonmoving party submits evidence that is "merely colorable," or is not "significantly probative," summary judgment may be granted. *Anderson*, 477 U.S. at 249–50.

> The mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact. As to materiality, the substantive law will identify which facts are material. Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment. Factual disputes that are irrelevant or unnecessary will not be counted.

*Id.* at 247–48.  To present a "genuine" issue of material fact, there must be contradictory

evidence "such that a reasonable jury could return a verdict for the non-moving party."  *Id.* at

248.

If the nonmoving party has failed to make a sufficient showing on an essential element of

his case with respect to which he has the burden of proof at trial, then summary judgment is

appropriate.  *Celotex*, 477 U.S. at 322.  In such a situation, "there can be 'no genuine issue as to

any material fact,' since a complete failure of proof concerning an essential element of the

nonmoving party's case necessarily renders all other facts immaterial."  *Id.* at 322–23; *accord*

*Goenaga v. March of Dimes Birth Defects Found.*, 51 F.3d 14, 18 (2d Cir. 1995) (movant's

burden satisfied if he can point to an absence of evidence to support an essential element of

nonmoving party's claim).  In short, if there is no genuine issue of material fact, summary

judgment may enter.  *Celotex*, 477 U.S. at 323.

## II.    Background

### A.  Factual Background

#### 1.   *The Property*

In August 2001, Steve and his then-wife Erika acquired the property at 58 Lebanon Road,

Bethany, CT 06524 (the "Property") for $349,000 by warranty deed.  *See* 2001 Deed, Ex. B to

Def.'s Mot. for Summ. J, Doc. No. 44-3.  In November 2006, Steve executed a $400,000

mortgage secured by the Property in which he and Erika were the mortgagors and his mother,

Liette, was the mortgagee.  *See* 2006 Mortgage, Ex. C to Def.'s Mot. for Summ. J., Doc. No. 44-

4.  In 2012, Erika quit-claimed her interest in the Property to Steve.  *See* 2012 Quitclaim Deed,

Ex. D to Def.'s Mot. for Summ. J., Doc. No. 44-5.  Steve thus owned an undivided interest in the

Property.  However, on March 14, 2016, Liette obtained an order of strict foreclosure against

Steve, and title vested in Liette on May 6, 2016, at which point Liette owned an undivided

interest in the Property.  *See* 2016 Foreclosure, Ex. E to Def.'s Mot. for Summ. J., Doc. No. 44-

6.  On September 13, 2017, Liette sold her interest in the Property by warranty deed for

$150,000.  *See* 2017 Deed, Ex. F to Def.'s Mot. for Summ. J., Doc. No. 44-7.  Thus, as of

September 13, 2017, the Plaintiffs no longer had an ownership interest in the Property.

At the times relevant to this case, Steve used the Property as a second home.  Liette lived

in Palm Beach, Florida, and never used the Property; Steve's primary residence was in West

Harrison, New York.  *See* Def.'s Local Rule 56(a)1 Stmnt. ("56(a)1 Stmnt."), Doc. No. 44-1, at

¶¶ 6, 30.  Steve used and maintained the Property.  *See id.* at ¶ 7.  Most weekends, Steve went to

the Property and usually stayed overnight.  *See id.* at ¶ 31.

### 2. *March 16, 2016:  Steve Discovers the Loss*

On March 16, 2016, Steve arrived at the Property and discovered that it was, essentially,

ruined.  *See id.* at ¶ 2.  (I will refer to the damage that occurred at the Property as the "Loss.")

Steve explained that when he arrived, he was unable to open the side door (where he usually

entered) because the door was swollen shut.  Examination Under Oath, Ex. G to Def.'s Mot. for

Summ. J. ("Steve's EUO"), Doc. No. 44-8, at 72:15–73:4.  Although the Property's exterior

appeared unchanged, Steve observed condensation on the windows.  *See id.* at 74:11–21.  When

Steve entered, he reported that the Property was a "hot house" and looked like "a greenhouse"

with "water everywhere."  *Id.* at 76:13–14.  The Property's living area had "water dripping down

the back of the wall" and "water on the floor."  *Id.* at 77:3–10.

### 3. *The Policy*

At the time of the Loss, the Plaintiffs were insureds on the Policy, a homeowners'

insurance policy issued by Great Lakes.  *See* 56(a)1 Stmnt., Doc. No. 44-1, at ¶ 4; Policy, Ex. A

to Badders Aff. (the "Policy"), Doc. No. 44-26, at 3.  The Policy was an "all risk" Policy that

protected against every kind of loss not explicitly excluded.  *See* Pl.'s Local Rule 56(a)2 Stmnt.

of Add'l Facts ("56(a)2 Stmnt."), Doc. No. 53-1, at 21 (¶ 9); Badders Depo. Tr., Ex. P to Def.'s

Mot. for Summ. J., Doc. No. 44-17, at 16:19–21.  The Policy contained a "Freezing Exclusion"

that explained that Great Lakes did not insure

> for loss . . . [c]aused by . . . [f]reezing of a plumbing, heating, air conditioning or
> automatic fire protective sprinkler system or of a household appliance system or of
> a household appliance, or by discharge, leaking or overflow from within the system
> or appliance caused by freezing.

Policy, Doc. No. 44-26, at 29–30.  However, two exceptions applied to the Freezing Exclusion:

> This provision does not apply if you have used reasonable care to: (a) Maintain heat
> in the building; or (b) Shut off the water supply and drain all systems and appliances
> of water.

*Id.* at 30.  Only the first exception (the "Heat Exception") is relevant here.[1]  The Policy also

included a "Mold Exclusion" that read, in relevant part:

> Notwithstanding any other provision in this Policy, there is no coverage . . . for any
> loss or damage involving in any way the actual or potential presence of mold,
> mildew or fungi of any kind whatsoever, whether or not directly or indirectly
> caused by or resulting from an insured peril.

*Id.* at 8.  In addition, the Policy also excluded coverage for loss *caused by* mold (subject to an

exception not applicable here).  *See id.* at 30.

4.  *Brief Overview:  Different Sides to the Story*

Steve claims he was shocked when he saw the Property on March 16, 2016.  Steve

maintains that he had been there one month before—from about February 11 to 14, *see* 56(a)1

Stmnt., Doc. No. 44-1, at ¶¶ 32–33—and the Property looked perfectly fine.  Moreover, Steve

---

[1] Steve confirmed that the water was on at the Property on March 16 and that he had not turned off the water during
his last visit.  *See* 56(a)1 Stmnt., Doc. No. 44-1, at ¶ 45; Def.'s Mem. of Law in Supp. of Mot. for Summ. J., Doc.
No. 44-24, at 12 n.1 (citing Steve's EUO testimony).

claims that he had been at the Property twice in early December 2015 and once in January 2016, and the Property seemed fine then, too.  Steve believes that the Loss occurred due to a pipe bursting sometime between February 15 and March 16.  Steve does not believe that the pipe necessarily burst due to freezing.

Great Lakes believes that the Loss was plainly due to a freeze-up that caused a pipe to rupture.  Whenever Steve was last at the Property, Great Lakes believes that Steve probably left on the Property's two thermostats, but they were battery-powered, and the batteries subsequently died.  As a result, the thermostats could no longer trigger the furnace to heat the Property.  Steve never arranged for someone to check on the Property while he was gone; the Property got so cold that a water pipe froze and burst, which covered the Property with water and then mold.

More fundamentally, Great Lakes believes that Steve is lying about how often he visited the Property during the winter of 2015–16.  According to Great Lakes, it is probable that Steve had not been to the Property since November 2015.  First, Great Lakes notes that on March 16, the furnace was over half full with oil, but oil delivery tickets for the Property indicate Steve had not ordered oil since early 2015.  To Great Lakes, that discrepancy indicates that the heating system was not working at all during the cold winter months because the thermostats had already died.  Second, Great Lakes emphasizes an eye-popping rise in electricity charges from December 22, 2015 to February 23, 2016.[2]  According to Great Lakes, that extraordinary jump reflects the enormous amount of electricity being used by the Property's water pump, which was pumping an abnormal amount due to the burst pipe, which was leaking.  Finally, Great Lakes points to Steve's cell phone records, which indicate that—even though he used his phone multiple times

---

[2]  The charge for December 22, 2015 to January 22, 2016 was $374.48.  And the charge for January 22, 2016 to February 23, 2016 was for $718.94.  Before that rise, since winter 2014, no single electricity charge had exceeded $126.55.  In the five months before December 22, for instance, the electricity charges ranged from $52.78 to $59.84. *See* Electricity Bills, Ex. J to Badders Aff., Doc. No. 44-35.

daily—Steve did not make or receive a single call from Bethany, Connecticut (the town in which

the Property is located) between November 8, 2015 and March 16, 2016.  From February 11 to

14, in particular, Steve was a party to 26 calls, none of which had a terminus in Connecticut, and

many of which originated in White Plains, New York.  *See* Phone Records, Ex. S to Def.'s Mot.

for Summ. J., Doc. No. 44-20, at 4–48.

     5.   *Post-March 16 Developments*

       Great Lakes found out about the Loss on March 16, when the Plaintiffs' insurance broker

sent Great Lakes a fax explaining the cause of loss as "Burst Pipe/Water Damage" and indicating

that Steve had been "on vacation and a pipe burst."  56(a)1 Stmnt., Doc. No. 44-1, at ¶ 18.  Great

Lakes immediately retained an adjuster, Brian Rollinson, to investigate the claim, inspect the

Property, and interview Steve.  *See id.* at ¶ 19.  On March 17, Rollinson contacted Steve by

phone.  *See* Emails, Ex. D to Badders Aff., Doc. No. 44-29, at 2.  After speaking, Rollinson

emailed Steve and asked for photos, copies of oil delivery tickets, and electricity bills.  *See id.*

Rollinson memorialized his understanding that Steve was absent from the Property between

February 15 and March 16 and that "no one else was there in between."  *Id.*  On March 18, Steve

responded; he confirmed "no one was checking on the house while I was away" and attached

five photos of the Loss that Steve had taken on March 16.  *See id.*

       Also on March 18, Rollinson inspected the Property and took 38 photographs.  Rollinson

determined that a pipe had frozen and burst, leading to extensive water and mold damage to the

Property's interior.  *See* Rollinson Report, Ex. F to Badders Aff. ("Rollinson Report"), Doc. No.

44-31, at 3.  Rollinson also noted that the "interior needs to be gutted" and that "[a]ny contents

inside the home are a total loss."  *See id.* at 4.  Steve told Rollinson that Steve "call[ed] for oil

when needed," that "there was oil in the tank prior to the loss," and that "there has been

continuous electric service."  *Id.*  Steve believed "the power may have shut off while he was

away because this has happened 2-3 times previously."  *Id.*  Rollinson further asked Steve to

"submit copies of the last oil delivery ticket and utility bills to confirm the heat was maintained."

*Id.*

      Between March 18 and April 18, Steve supplied Rollinson with numerous documents,

including a claim form questionnaire, oil delivery receipts, and electricity bills.  The claim form

questionnaire's header read:  "Insured Claim Form (Freeze-Up)."  Questionnaire, Ex. I to

Badders Aff. ("Questionnaire"), Doc. No. 44-34.  In the questionnaire, Steve explained that no

one checked on the Property while he was away between February 15 and March 16; in general,

his friend Jamie Verab "plowed the driveway in Winter but did not go inside."  *See id.*  Steve

also explained that he left the heat on "usually between 40 + 60."  *See id.*  As described above,

Steve's electricity bills detailed an eye-popping rise in electricity charges for the Property from

December 22, 2015 to February 23, 2016.  *See* Electricity Bills, Ex. J to Badders Aff., Doc. No.

44-35, at 3.  Finally, oil delivery tickets indicated that the last delivery was for 200 gallons on

March 20, 2015.  *See* Oil Receipts, Ex. K to Badders Aff., Doc. No. 44-36, at 5.[3]  On April 18,

Rollinson wrote the Plaintiffs a letter citing the Freezing Exclusion and the Mold Exclusion.  *See*

Letter, Ex. G to Badders Aff., Doc. No. 44-32.  On May 5, 2016, Rollinson wrote another report

---

[3] Steve admitted in his deposition on May 20, 2019 that he did not find or have any other oil delivery receipts.  *See* 56(a)1 Stmnt., Doc. No. 44-1, at ¶ 66b.  However, Steve still disputes that the last oil delivery occurred in March 2015.  In emails to Rollinson in late April 2016, Steve suggested that the records were off because he sometimes paid the oil delivery company in cash, and he did not believe that their records reflected that.  *See* Emails, Ex. L to Badders Aff., Doc. No. 44-37.  Indeed, Steve believed that there was a "time where there was a double charge [on his credit card] and they had no record of that and made another oil delivery to compensate for the fact that they charged the card twice."  Steve Depo. Tr., Ex. R to Def.'s Mot. for Summ. J., Doc. No. 44-19, at 20:20–24.  Steve explained that he often deals in cash because there is a judgment against him in Virginia for $2.4 million and so he does not keep money in bank accounts that might help his adversary satisfy that judgment.  *See* Steve's EUO, Doc. No. 44-8, at 61:17–62:14.

which recommended that Great Lakes assign an engineer—Tom Mierzwa—to determine the

cause of loss.  *See* Rollinson Report 2, Ex. H to Badders Aff., Doc. No. 44-33.

     a.   Mierzwa Report and Deposition

On July 18, 2016—after visiting the Property on May 16 and taking dozens of

photographs, speaking with Steve, and reviewing electricity bills, oil delivery tickets, thermostat

installation guides, and weather data—Mierzwa issued a report on the cause of the Loss.  *See*

56(a)1 Stmnt., Doc. No. 44-1, at ¶¶ 24–26.  Mierzwa concluded that (1) the source of the water

damage was a pipe/faucet break near the kitchen sink; (2) the pipe break followed a freeze-up

sometime during January and February 2016; (3) the Property was so cold because the

thermostats' batteries had died; and (4) the lack of oil deliveries since March 2015—and the fact

that the oil tank was still half full—indicated that very little, if any, heat was consumed in the

winter of 2015–16, and so the batteries might have died before the winter began.  *See* Mierzwa

Report, Ex. A to Mierzwa Aff. ("Mierzwa Report"), Doc. No. 44-43, at 26.

Regarding the thermostat batteries, Mierzwa observed that the Property's two thermostats

had digital faces that were "blank and no buttons worked when pressed" and that the units were

not hard-wired into the Property's electrical grid.  *Id.* at 11, 16.  However, Mierzwa admitted that

he was not an expert electrician.  Mierzwa Depo. Tr., Ex. O to Def.'s Mot. for Summ. J.

("Mierzwa Depo."), Doc. No. 44-16, at 11:8–24.  Mierzwa also admitted that he neither tested

the batteries, nor checked to see if they had an expiration date.  *See* 56(a)2 Stmnt. of Add'l Facts,

Doc. No. 53-1, at 22 (¶¶ 16–17).

Regarding the oil delivery receipts, Mierzwa explained that the combination of no

receipts since March 2015 and the oil tank's still being half full on March 16, 2016 indicated that

"there was little to no oil consumption within the heating unit since approximately Fall 2015."

Mierzwa Report, Doc. No. 44-43, at 23.  As described above, Mierzwa also believed that the staggering increase in electricity usage from December 22, 2015 to February 23, 2016 indicated that the well pump—which ran on electricity—had been running continuously during that time. *See id.* at 22.[4]

After examining weather records in Bethany, Connecticut during the relevant times, Mierzwa identified three periods when sustained freezing temperatures were most likely to have caused a freeze-up:  (a) January 4–5; (b) January 18–23; and (c) February 11–15.  *See id.* at 25. Mierzwa believed January 4–5 was the most likely period because of the enormous amount of electricity that was consumed at the Property during January and February.  *See id.*  Importantly, Mierzwa noted that that theory "conflicts with" Steve's claim that "he was at the house on or about the beginning of February 2016 where [] everything appeared to be ok."  *See id.*

Mierzwa was deposed on March 22, 2019.  There, Steve's lawyer succeeded in getting Mierzwa to admit that corrosion or rusting alone can cause a pipe to rupture.  *See* Mierzwa Depo., Doc. No. 44-16, at 31:15–32:20.  But that admission followed testimony indicating that Mierzwa still believed what he wrote in his report:  The pipe under the kitchen sink burst from a freeze-up sometime, most likely, in January.  Steve's lawyer also got Mierzwa to admit that the batteries in the thermostats could have died *after* the pipe burst.  *See id.* at 40:8–23.  However, again, that statement followed testimony regarding how unlikely Mierzwa considered that possibility, especially because the batteries were not corroded, which would have been expected if the batteries died of moisture.  *See id.*

---

[4]  More technically, "[o]nce the water was leaking/streaming out of the pipe break, the pressure in the pressure tank dropped, thus tripping 'on' the low pressure relay switch that would 'engage' the well pump to turn on and provide water to the system."  *See* Mierzwa Report, Doc. No. 44-43, at 25.

b.   Steve's Examination Under Oath and Deposition

On May 30, 2017, almost a year after the Mierzwa Report, Great Lakes examined Steve

under oath.  *See* 56(a)1 Stmnt., Doc. No. 44-1, at ¶¶ 28–29.  Steve explained that before March

16, 2016, he had last been to the Property from about February 11 to 14 before leaving for a

work conference in Phoenix on February 15.  *See id.* at ¶¶ 32–33.  In a later affidavit, Steve's

friend—who also plowed his driveway—swore that Steve "paid me . . . in person and in cash" on

February 11.  Verab Aff., Ex. M to Pl.'s Opp'n, Doc. No. 53-14, at ¶ 7.  Steve also testified that

he visited the Property twice in December and at least once in January.  *See* Steve's EUO, Doc.

No. 44-8, at 46:9–14; 50:2–5; 55:17–22.

Steve had no explanation for the high electricity charges except to admit that he knew of

them at the time, was perplexed, and called Eversource to come check its equipment.  *See id.* at

40:23–44:20; 49:16–53:10; 55:23–58:5.  Steve also explained that he generally took good care of

the heating system:  in 2005 he had a new heating system installed that included two thermostats.

*See id.* at 17:18–19:24.  The system was serviced yearly, but Steve did not know for sure whether

it was serviced in 2015.  *See id.* at 26:4–28:2.  Steve believed that the thermostats were

hardwired into the Property's electrical system and that the batteries were merely backups.  *See*

56(a)1 Stmnt., Doc. No. 44-1, at ¶ 37.  Still, Steve generally changed the thermostats' batteries

every two years, but he did not remember the last time before March 16, 2016 that he had

changed them.  *Id.* at ¶¶ 36–38; Steve's EUO, Doc. No. 44-8, at 29:3–30:10.  Steve "was in the

habit of looking" at batteries' expiration dates before installation and specifically recalled doing

so the last time he installed batteries in the thermostats.  Steve's EUO, Doc. No. 44-8, at 34:10–

35:3.  Steve also admitted that—even though he knew the heating system had shut down after

power interruptions in the past and required manual restart—he did not have someone check the

Property during the winter months.  *See* 56(a)1 Stmnt., Doc. No. 44-1, at ¶¶ 41–43.  On May 20,

2019, Steve was deposed and asked about his cell phone records. Steve acknowledged that the number associated with the records corresponded to his only mobile phone and that the Property had no landline at the relevant times. *Id.* at ¶¶ 68–71.

      c.   Initiation of Litigation and Plaintiffs' Expert

On July 17, 2017, Great Lakes sent a letter to Plaintiffs disclaiming coverage based on the Freezing Exclusion and the Mold Exclusion. *See* Letter, Ex. N to Badders Aff., Doc. No. 44-39. On October 4, 2017, Plaintiffs responded challenging the denial. *See* 56(a)1 Stmnt., Doc. No. 44-1, at ¶ 48. On October 16, Great Lakes re-affirmed its denial of coverage. *See id.* at ¶ 49. The Plaintiffs filed suit in February 2018. *See id.* at ¶ 50.

The Plaintiffs produced James Maguire as an expert on property damage restoration, and Maguire produced an expert report on July 11, 2018. *See id.* at ¶ 54. In April or early May 2016, Steve had called Maguire. *See* Maguire Depo. Tr., Ex. Q to Def.'s Mot. for Summ. J. ("Maguire Depo."), Doc. No. 44-18, at 9:24–10:1; 27:5–28:13. In early May 2016, Maguire went to examine the Property. *See id.* at 10:13–11:11; 28:14–23. Maguire explained that the water damage affected the entire Property and that mold damage was "all over." *See id.* at 13:21–25; 15:11–12. Maguire initially was interested not only in working on the Property for Steve, but also in potentially acquiring it for himself and flipping it; however, Maguire never made an offer to purchase the Property. *See* Steve Depo. Tr., Ex. R to Def.'s Mot. for Summ. J., Doc. No. 44-19, at 23:1–25:8. In the summer of 2016, the Plaintiffs hired Maguire to undertake mold remediation, completely gut the Property's interior, demolish its interior structures, and remove and discard its contents. *See* Maguire Depo., Doc. No. 44-18, at 60:20–65:19. In late September or early October 2016, Maguire did that work, and the Plaintiffs paid him $34,055. *See id.* at 48:14–49:5.

On May 9, 2017, Steve emailed Maguire asking for a price on "completely knocking the house down" because "[w]e may have a tear down client who wants to build custom on the foundation that is already there." Email, Ex. J to Def.'s Mot. for Summ. J., Doc. No. 44-11, at 3. Maguire responded that he was interested: "Demolition would be about $22,500" and "rebuilding [] runs about $150- $200 per sq ft" but "prints and specs" were required "for an exact number." *Id.* at 2. Steve emailed back to inquire further both about the per foot cost of rebuilding and the possibility of renovating the existing structure rather than completely knocking it down. *See id.* Maguire responded that "[t]he 150-200 includes just about everything" and that "renovating the existing structure" doesn't "save as much as you think": the "[b]allpark for that is probably $100-$150" depending "on what you put back." *Id.* On August 10, 2017, Steve emailed Maguire and asked him, so long as he agreed, to "put something in writing to th[e] effect [] that minus the mold remediation, the house would have still required a full gut job based on the water damage alone?" Email, Ex. K to Def.'s Mot. for Summ. J., Doc. No. 44-12. Steve also asked Maguire for a "construction estimate on completing the house back to its original form." *Id.* Maguire responded on August 14: "I cannot definitively say, my guess is it probably could. It would depend on the temperature of the water and how long it sat on the affective areas." Email, Ex. L to Def.'s Mot. for Summ. J., Doc. No. 44-13. Regarding the rebuild, Maguire explained: "A 'ballpark' price on putting it back together is about $100 per sq ft. This depends on the specifications of the rebuild." *Id.*

On June 15, 2018, the Plaintiffs submitted a damages analysis that sought $285,600, which they claim is the amount that it would have cost to rebuild the Property's interior. *See* Damages Analysis, Ex. V to Def.'s Mot. for Summ. J., Doc. No. 44-23. The amount was "based upon an estimate from JP Maguire Associates which assessed the cost [of rebuilding] to be at

$150 - $200 per square foot." *Id.* at n.1 ($285,600 is $175 multiplied by the Property's prior square footage (1,632 feet)).

Maguire's July 2018 expert report explained that the Property was "covered with microbial growth" and the "only remedy was to completely gut the interior." Maguire Report, Ex. A to 26(a)(2) Disclosure ("Maguire Report"), Doc. No. 44-14, at 6. Maguire further explained that—had there been no microbial growth and only water damage—the damages would have been substantially similar. *See id.* Maguire wrote: "If the only damage was water/excessive humidity, the demolition cost would be lessened by about 1/3, from $34,055 to $22,476, as it would have been able to be done without personal protective equipment and some of the demolition would be unnecessary." *Id.* Further, "[t]he reconstruction costs would only change by a reduction in scope and I would still estimate between $244,800 and $326,400." *Id.*

On May 9, 2019, Maguire was deposed. *See* 56(a)1 Stmnt., Doc. No. 44-1, at ¶ 58. There, Maguire admitted that Steve had retained him not to determine the cause of the Loss but rather to determine what repairs were required by water damage alone, as opposed to mold damage. *See id.* at ¶ 59. Maguire further admitted that when he estimated the cost of the rebuild at $150 to $200 per square foot, that was merely a "ballpark" figure that was "an approximate range based on jobs of similar scope and size." Maguire Depo., Doc. No. 44-18, at 18:13–14; 53:10–11. Maguire explained that he often used a software program to estimate costs of reconstruction, but he did not use it for his expert report in this case. *See* 56(a)1 Stmnt., Doc. No. 44-1, at ¶¶ 62–63. To estimate the costs of reconstruction in this case, Maguire relied on pictures and his own memory of the damages from his work in 2016. *See id.* at ¶ 64. Maguire explained that he "decided [] based on the pictures that there was a lot of water damage and

water condensed on the walls" and so the damage would have been about the same with or without mold.  Maguire Depo., Doc. No. 44-18, at 58:10–59:1.

### B. Procedural Background

The Plaintiffs filed the operative complaint in Connecticut Superior Court on February 8, 2018.  *See* Compl., Doc. No. 1-1, at 5.  Great Lakes removed the case to this court on March 14, 2018.  *See* Notice of Removal, Doc. No. 1, at 1.  The case was assigned to District Judge Warren W. Eginton.  Discovery concluded in late spring 2019 and on August 15, 2019 Great Lakes made the instant motion for summary judgment.  *See* Def.'s Mot. for Summ. J., Doc. No. 44.  The Plaintiffs filed their opposition on September 19, 2019.  *See* Pl.'s Opp'n to Mot. for Summ. J. ("Pl.'s Opp'n"), Doc. No. 53.  The case was transferred from Judge Eginton to me on October 9, 2019.  Great Lakes filed a reply to the Plaintiffs' opposition on October 29, 2019.  *See* Reply, Doc. No. 60.  The parties agree that Connecticut law governs this contractual dispute.  *See* Def.'s Mem. of Law in Supp. of Mot. for Summ. J. ("Def.'s Mem."), Doc. No. 44-24, at 8–9; Pl.'s Opp'n, Doc. No. 53, at 5.  On January 14, 2020, I held a hearing on Great Lakes's motion for summary judgment, and I took the motion under advisement.  *See* Min. Entry, Doc. No. 68.

## III.   Discussion

### A. Standard of review

"An insurance policy is to be interpreted by the same general rules that govern the construction of any written contract and enforced in accordance with the real intent of the parties as expressed in the language employed in the policy."  *Hammer v. Lumberman's Mut. Cas. Co.*, 214 Conn. 573, 583 (1990) (quoting *Schultz v. Hartford Fire Ins. Co.,* 213 Conn. 696, 702 (1990)) (internal quotation marks and citations omitted); *see also Buell Indus., Inc. v. Greater New York Mut. Ins. Co.*, 259 Conn. 527, 538 (2002).  "The determinative question is the intent of

the parties, that is, what coverage the . . . [plaintiff] expected to receive and what the defendant

was to provide, as disclosed by the provisions of the policy." *Hammer*, 214 Conn. at 583. "If

the words in the policy are plain and unambiguous . . . the language . . . must be accorded its

natural and ordinary meaning." *Id.* If the policy is ambiguous, "such ambiguity is . . . resolved

against the insurance company." *Id.* at 584. "As with contracts generally, a provision in an

insurance policy is ambiguous when it is reasonably susceptible to more than one reading."

*Conn. Med. Ins. Co. v. Kulikowski*, 286 Conn. 1, 6 (2008) (internal quotation marks and citations

omitted). "The burden of proving that an exclusion applies is on the insurer, but the insured has

the burden of proving that an exception to an exclusion reinstates coverage." *Capstone Bldg.*

*Corp. v. Am. Motorists Ins. Co.*, 308 Conn. 760, 787–88 n.24 (citing *Buell Indus.*, 259 Conn. at

551).

B. <u>Freezing Exclusion</u>

The Policy's Freezing Exclusion denies coverage for losses "caused by" a frozen pipe—

or a subsequent leak—unless the Heat Exception applies. Thus, whether the Freezing Exclusion

applies and bars coverage for the Loss depends on:  (1) whether the pipe burst because of a

freeze-up, and, if so, (2) whether Steve took reasonable care to maintain heat at the Property.  I

hold that no genuine issue of material fact exists regarding (1):  the Loss was caused by a water

leak, which occurred because a pipe burst as a result of a freeze-up.  But a genuine issue of

material fact does exist regarding (2):  a reasonable juror could find that Steve took reasonable

care to maintain heat at the Property.  Thus, Great Lakes is not entitled to summary judgment

based on the Freezing Exclusion.

16

1. *Freeze-up*

Great Lakes argues that the Loss was plainly caused by a frozen pipe that burst. *See* Def.'s Mem., Doc. No. 44-24, at 10–11. First, Steve's own claim form—a "Freeze-Up" questionnaire—indicated that he believed the Loss occurred due to a freeze-up. *See* Questionnaire, Doc. No. 44-34. Second, Steve testified that he believed the Loss occurred because "the power tripped in the house"—which "happened a couple of times before"—and the furnace "had not restarted after the power had gone out." Steve's EUO, Doc. No. 44-8, at 82:9–16. In other words, Great Lakes argues, and Steve himself admits, that lack of heat caused the Loss. Third, Rollinson (the adjuster) concluded that the Loss occurred due to a freeze-up. *See* Rollinson Report, Doc. No. 44-31, at 3. And, fourth, Mierzwa (the engineer) also concluded— "to a reasonable degree of engineering certainty"—that the cause of the Loss was a freeze-up. *See* Mierzwa Aff., Doc. No. 46, at ¶ 38a.

Plaintiffs have tried to poke holes in Great Lakes's theory, but they have not succeeded in creating a genuine dispute of material fact. Plaintiffs emphasize, for instance, Mierzwa's theory that the most likely timing for the freeze-up was January 4–5. *See* Pl.'s Opp'n, Doc. No. 53, at 7. Plaintiffs argue that that timing cannot be correct because there was no visible water damage when Steve was at the Property in January and from February 11 to 14. *See id.* at 8. Plaintiffs also point out that Mierzwa admitted during his testimony that he did not physically see or inspect a pipe rupture and that it was possible that the cause of the Loss was a pipe that burst from corrosion. *See id.*

In response, Great Lakes argues that Plaintiffs' "bare assertions" are "nothing more than unsupported speculation as to what may have happened." Reply, Doc. No. 60, at 9. Indeed, just because Mierzwa could not definitively rule out all other possible causes of loss does not "overcome the expert's determination that the cause of the loss was a pipe freeze, which then

17

broke and leaked when the temperature became warmer." *Id.* at 10.  Great Lakes also argues that Mierzwa's testimony was not inconsistent with Steve's visiting schedule:  Mierzwa testified that the leak could have started small and expanded over time.  *See id.* at 11.  Thus, the pipe could have fractured in January, and Steve still might not have noticed any water damage on his February visit.  *See id.* at 11–12.

There is no genuine dispute that the cause of the Loss was a freeze-up.  Great Lakes has submitted numerous pieces of probative evidence that indicate a freeze-up occurred.  Rollinson and Mierzwa agree that the Loss was, in essence, a classic freeze-up.  Steve's own claim submission and testimony also seem to indicate that he understood the cause of loss to be a freeze-up.  Plaintiffs' counsel's attempts to poke holes in the freeze-up theory are unpersuasive.  Those attempts rest on caveated admissions by Mierzwa.  As discussed above, Mierzwa did say that the most likely dates for the freeze-up were in early January, and he did admit that corrosion alone can cause a pipe to burst.  But Mierzwa never said the freeze-up could have happened only in early January, and he said the freeze-up could have started small and gotten bigger.  Further, Mierzwa was clear that—by far—the most likely cause of loss was a freeze-up and not simply corrosion.  In sum, there is no genuine dispute of material fact that the Loss occurred due to a freeze-up.

### 2.  *Heat Exception*

The Heat Exception applies if Steve took reasonable care to maintain heat at the Property.  Whether Steve acted reasonably in maintaining the heat is an objective inquiry.  *See McCartney v. Pawtucket Mut. Ins. Co.*, 1994 WL 723056, at *3 (Conn. Super. Ct. Dec. 23, 1994).  The question is whether Steve acted as a reasonably prudent person would under the circumstances.  *See id.* at *2.  Because a reasonable juror could conclude that Steve exercised reasonable care in

18

maintaining heat at the Property, I must **deny** Great Lakes's motion for summary judgment on the ground that the Loss is excluded under the Freezing Exclusion.

   a.   Great Lakes's Arguments

Great Lakes argues that Steve's efforts to maintain heat were objectively unreasonable and analogizes to numerous cases—many of which are out-of-district—to support its position.

- In *McCartney v. Pawtucket Mut. Ins. Co.*, the plaintiff's home had been unoccupied for about nine months (April to the following January). 1994 WL 723056. Despite showing concern about the home's oil supply (and having her son check the supply once), the court found that the plaintiff had been objectively unreasonable because she should have either "maintained or renewed the contract for automatic fuel delivery or . . . provide[d] a person with a key to the house so that that person could ascertain for her the quantity of fuel in the tanks." *Id.* at *3.

- In *Pazianas v. Allstate Ins. Co.*, the plaintiff left his home in Pennsylvania from October to the following February. 2016 WL 3878185 (E.D. Pa. July 18, 2016). Before he left, the plaintiff set his thermostat at 55 degrees and arranged for his daughter to check on the property while he was gone, but she did not. While the plaintiff was gone, the batteries in the thermostats died, and a freeze-up occurred. The plaintiff had not replaced the batteries in over one year. The court found that, on these facts, "no reasonable juror could find that Pazianas used reasonable care to maintain heat in the Property during its vacancy." *Id.* at *5.

- In *Stephenson v. Allstate Indemnity Co.*, a plaintiff left her property for three months—from December to the following March—and a freeze-up ensued. 73 N.Y.S. 3d 804, 806 (N.Y. App. Div. Apr. 19, 2018). The court found that the plaintiff had failed to use reasonable care as a matter of law because she did not arrange for anyone to check on the property while she was gone. *See id.*

- In *Evangelista v. Hingham Mut. Fire Ins. Co.*, the plaintiffs' summer home in North Falmouth suffered a freeze-up after they had left it for the winter (intending not to return until the following summer). 2005 WL 705840 (Mass. Super. Ct. Feb. 14, 2005) (bench trial, not summary judgment). The plaintiffs set the thermostat at 63 degrees, did not leave a key with anyone, and did not hire anyone to check on the property. Before the freeze-up, the plaintiffs had received an electricity bill at their primary address indicating that no electricity had been consumed at the property in the preceding billing period. The court found—based on all those factors—that the plaintiffs had not reasonably maintained the heat. *See id.* at *3.

- In *Elkin v. State Farm Ins. Co.*, a freeze-up occurred in plaintiff's vacant home in Minnesota.  2013 WL 3340126 (D. Minn. July 2, 2013).  The court granted the defendant insurance company's motion for summary judgment because the plaintiffs had objectively not used reasonable care to maintain the heat in their home.  The plaintiffs ignored warnings from a state agency and their realtor and bills showing no gas usage.  *See id.* at *5.

- In *Cecero v. Allstate Ins. Co*., the Third Circuit reversed a district judge who, before submitting the case to the jury, ruled that the insured, as a matter of law, had used reasonable care to maintain heat in the property because the plaintiff had presented evidence that the property had been stocked with oil and the thermostats had been working.  303 F. App'x 111, 115 (3d Cir. 2008).  The Third Circuit, however, found conflicting evidence regarding whether: the thermostat was connected, the oil maintenance company had performed maintenance the previous year, and the plaintiff had checked the oil levels.  *See id.* at 112–13.

Great Lakes argues that Steve is like the plaintiffs in the above-described cases.  For one, Great Lakes believes that it was objectively unreasonable for Steve not to have hired someone to check on the Property during the extended period that Steve was gone.  Def.'s Mem., Doc. No. 44-24, at 18.  Indeed, it would have been easy to do so because Steve already paid Jamie Verab to plow the Property's driveway whenever it snowed.  *See id.*  Steve also knew that winter temperatures in Bethany, Connecticut are often below freezing and that the Property's furnace had failed to re-ignite after power interruptions in the past.  *See id.* at 14.  Although Steve claims that he believed the two thermostats were hardwired and had batteries only as back-ups, Steve clearly knew that maintaining the batteries was important because he admitted that he changed the batteries from time to time—but he did not know the last time he had changed them.  *See id.* at 16.  For those reasons, it was unreasonable for Steve not to take precautions against a potential power outage in the winter months.  *See id.* at 19.

Great Lakes also argues that Steve's belief that he had oil delivered in December 2015 is simply belied by the evidence:  Despite being asked to produce that oil delivery ticket, "neither

he nor his oil delivery company had any records of such a delivery or any delivery of heating oil after March 2015." Reply, Doc. No. 60, at 14. Similarly, Great Lakes argues that—despite Steve's belief that he had his furnace serviced yearly—no records confirm whether the furnace had been serviced in 2015. *See id.* Finally, Great Lakes points to Steve's phone records to suggest that Steve's absence was likely far greater than one month, as he claims, and more like five months. *See id.* at 15. That difference, Great Lakes claims, makes the analogy between this case and the cited cases even closer.

b. Plaintiffs' Arguments

The Plaintiffs argue both that "reasonableness" is a question best resolved by a jury, and, in any event, that Steve took reasonable care to maintain the heat at the Property. First, the Plaintiffs point out that there was no need for Steve to arrange for someone to check on the Property because Steve "himself regularly came to check on the Property." Pl.'s Opp'n, Doc. No. 53, at 12. The Plaintiffs also argue that Steve reasonably maintained the oil tank. An inspection by Great Lakes's underwriter in May 2015 noted that the "boiler" was in "good" condition. *See* NEIS Report, Ex. F to Pl.'s Opp'n, Doc. No. 53-7. And, even though the furnace had to be restarted after a power outage "on a couple of rare instances," Steve appropriately monitored that situation because he "routinely had the furnace serviced." Pl.'s Opp'n, Doc. No. 53, at 12–13.

With respect to the thermostat batteries, the Plaintiffs argue that it is unclear whether the thermostat batteries were actually dead. Indeed, Mierzwa "did not take the batteries out of the thermostat," "he did not test them," and he "did not check to see if the batteries had an expiration date on them." *Id.* at 13. Mierzwa also admitted that it was "possible that [the] batteries died due to water moisture [] after the pipe burst." *Id.* The Plaintiffs further note that Steve changed

21

the batteries every two years, that he was "in the habit of looking at whether or not something is expired," and that he specifically checked the expiration date on the batteries the last time he changed them.  *Id.* at 14.  Regarding Steve's phone records, the Plaintiffs claim that it is "not unreasonable to believe that he came to Connecticut for a short visit and did not place any calls on his cell phone while in the State."  *Id.* at 13.  Besides, the Plaintiffs note, Jamie Verab corroborates Steve's presence at the Property on February 11.  *See id.*  The Plaintiffs also argue that the precedent on which Great Lakes relies is inapposite.  In particular, the Plaintiffs point out that Steve's period of absence—just one month—is much shorter than the period of absence in any of the cases that Great Lakes cites.  *See id.* at 10 n.7, 14.

      c.  Discussion

    A reasonable juror could conclude that Steve took reasonable care to maintain the heat at the Property.  I must accept as true that Steve was at the Property on February 11, 2016.  Despite the strong contradictory evidence—the cell phone records, the electricity bills, the amount of oil remaining in the oil tank, Mierzwa's estimation that the freeze-up occurred in early January— one can still (weakly) infer from the evidence (Steve's testimony and Verab's affidavit) that Steve was there.  That is an important conclusion: all Great Lakes's supporting precedent involves instances in which the plaintiff was absent for much more than one month.[5]  I am also unaware of any Connecticut court that has determined it to be unreasonable as a matter of law for a plaintiff to leave his second home vacant for one month.  Thus, I **deny** Great Lakes's motion on this ground.

---

[5] *McCartney*, 1994 WL 723056, at *3 (nine months); *Pazianas*, 2016 WL 3878185, at *3 (over four months); *Stephenson*, 73 N.Y.S.3d at 806 (three months); *Evangelista*, 2005 WL 705840, at *1 (almost one year); *Elkin*, 2013 WL 3340126, at *1–3 (eleven months); *Cecero*, 303 F. App'x at 112 (eight months).

C. Mold Exclusion

The Mold Exclusion reads:

Notwithstanding any other provision in this Policy, there is no coverage . . . for any loss or damage involving in any way the actual or potential presence of mold, mildew or fungi of any kind whatsoever, whether or not directly or indirectly caused by or resulting from an insured peril.

Policy, Doc. No. 44-26, at 8.  Great Lakes argues that the Mold Exclusion is an attempt at an anti-concurrent causation ("ACC") clause.  *See* Reply, Doc. No. 60, at 18.  A typical ACC clause reads:  "We do not insure for loss caused directly or indirectly by [uncovered peril].  Such loss is excluded regardless of any other cause or event contributing concurrently or in any sequence to the loss."  *See, e.g.*, *Lombardi v. Universal N. Am. Ins. Co.*, 2015 WL 600823, at \*2 (Conn. Super. Ct. Jan. 21, 2015).  Great Lakes further argues that most courts, including courts in Connecticut, routinely apply ACC clauses to "mean that where a loss results from multiple contributing causes, coverage is excluded if the insurer demonstrates that any of the concurrent or contributing causes of loss are excluded by the policy."  *Thurston Foods, Inc. v. Wausau Bus. Ins. Co.*, 2019 WL 2075880, at \*3 (D. Conn. Mar. 6, 2019); *see also Lombardi*, 2015 WL 600823, at \*15; *Union St. Furniture and Carpet, Inc. v. Peerless Indem. Ins. Co.*, 2013 WL 3871395, at \*3, \*6 (Conn. Super. Ct. July 3, 2013).  Applying that logic here, Great Lakes argues that because mold was one cause of the Loss, the entire Loss is excluded.

The Plaintiffs engage with Great Lakes's argument and claim, first, that several courts have disregarded ACC clauses on the grounds that such clauses, under the circumstances, were ambiguous or ran counter to public policy.  *See* Pl.'s Opp'n, Doc. No. 53, at 16–17 (citing *Corban v. United Servs. Auto. Ass'n*, 20 So. 3d 601, 615–16 (Miss. 2009);[6] *Safeco Ins. Co. of*

---

[6]  The Plaintiffs acknowledge that in *Thurston Foods* this court "declined to apply *Corban* and its progeny," but they attempt to distinguish *Thurston Foods*.  *See* Pl.'s Opp'n, Doc. No. 53, at 17 n.14.

*America v. Hirschmann*, 773 P.2d 413, 416 (Wash. 1989) (en banc); *Murray v. State Farm Fire*

*and Cas. Co.*, 203 W. Va. 477, 490 (1998); *Orleans Parish Sch. Bd. v. Lexington Ins. Co.*, 123

So. 3d 787, 805 (La. Ct. App. 2013)).  Second, the Plaintiffs argue that even treating the Mold

Exclusion as an enforceable ACC clause, the Loss is still covered because "the Property required

remediation due to the water damage, irrespective of the mold damage."  Pl.'s Opp'n, Doc. No.

53, at 17.

 I will not treat the Mold Exclusion as an ACC clause.  First, the Mold Exclusion's

language is different from the language of a typical ACC clause.  The difference is especially

important because a different part of the Policy contains a typical ACC clause.  Under the title

"Section I – Exclusions," the Policy reads:  "We do not insure for loss caused directly or

indirectly by any of the following.  Such loss is excluded regardless of any other cause or event

contributing concurrently or in any sequence to the loss."  Policy, Doc. No. 44-26, at 32.  That

section of the Policy then lists such perils as ordinance or law, earth movement, and nuclear

hazard.  *See id.* at 32–33.  Mold is not included.  The presence of a more traditional ACC clause

in the Policy is significant for two reasons.  First, loss caused by mold is not an excluded peril

under the traditional ACC clause in the Policy.  And, second, Great Lakes (the drafting party)

knew how to draft a traditional ACC clause, but it did not do so in the Mold Exclusion.

 The Mold Exclusion can simply be interpreted according to its unambiguous, plain terms.

In fact, the Mold Exclusion boils down rather neatly.  Recall that the Mold Exclusion reads:

> Notwithstanding any other provision in this Policy, there is no coverage . . . for any
> loss or damage involving in any way the actual or potential presence of mold,
> mildew or fungi of any kind whatsoever, whether or not directly or indirectly
> caused by or resulting from an insured peril.

Policy, Doc. No. 44-26, at 8.  Because this case regards only mold, the Mold Exclusion's

language regarding mildew, and fungi of other types is not relevant.  The final clause—"whether

or not directly or indirectly caused by or resulting from an insured peril"—means only that the
Mold Exclusion has nothing to do with any "insured peril."   The first clause—
"[n]otwithstanding any other provision in this Policy"— means that one must read the Mold
Exclusion independently.   Keeping those principles in mind, the Mold Exclusion reads:  "[T]here
is no coverage . . . for any loss or damage involving in any way the actual or potential presence
of mold."

      The parties do not discuss the issue, but the phrase "potential presence" is ambiguous
insofar as it does not define "potential."   The adjective "potential" means "existing in
possibility."  *Potential*, MERRIAM-WEBSTER'S COLLEGIATE DICTIONARY (10th ed. 2000).
Strictly speaking, then, any water damage might create the "potential presence" of mold.  But
such a reading of "potential" would run counter to other, fundamental parts of the Policy because
it would leave all water damage uncovered under the Policy.  As the parties acknowledge,
though, that would be incorrect:  certain water damage plainly is covered under the Policy.

      Great Lakes might argue that "potential" means "significant," which would encompass
the water damage in this case.  However, there is no evidence that the parties intended that
understanding.  *See Metro. Life Ins. Co. v. Aetna Cas. and Sur. Co.*, 255 Conn. 295, 306 (2001).
Indeed, the only other part of the Policy that so much as mentions mold does not use the word
"potential" and notes simply that Great Lakes does "not insure . . . for loss . . . caused by . . .
[m]old" (subject to an exception not applicable here).  Policy, Doc. No. 44-26, at 29–30.
Without evidence of such intent, "ambiguous language should be construed in accordance with
the reasonable expectations of the insured when he entered into the contract," which means that I
must interpret the relevant policy against the insurer.  *See Conn. Ins. Guar. Ass'n v. Fontaine*,

278 Conn. 779, 788 (2006) (internal quotation marks and citation omitted).  Thus, the presence of the word "potential" cannot absolve Great Lakes of coverage liability.

Given all that, the Mold Exclusion, in effect, reads:  "[T]here is no coverage . . . for any loss or damage involving in any way the actual . . . presence of mold."  Thus, Great Lakes is entitled to summary judgment with respect to any loss or damage that every reasonable juror would conclude involves the presence of mold in any way.  On the other hand, Great Lakes is not entitled to summary judgment for any loss or damage that a reasonable juror could conclude did *not* involve the presence of mold in any way.  The question becomes:  What parts of the Loss involved the presence of mold in any way?

Great Lakes argues that "most of the damages at the Premises were due to mold."  Def.'s Mem., Doc. No. 44-24, at 22.  Great Lakes points out that the photographs Steve took on March 16, the photographs that Rollinson took on March 18, and Steve's testimony regarding his discovering the Loss[7] confirm that "the bulk if not all of the damages to the property consisted of mold."  *Id.*  Further, Great Lakes points out that during Maguire's mold remediation, the Property's entire interior was gutted.  *See id.*  In contrast, there is no evidence, Great Lakes argues, that any part of the Loss was attributable *only* to water damage, which was confined, according to Great Lakes, to the "kitchen, adjacent hallway and basement."  *Id.* at 22 (citing Mierzwa Aff., Doc. No. 46, at ¶ 18).

The Plaintiffs do not attempt to separate portions of the Loss involving mold from other portions of the Loss that did not.  Instead, the Plaintiffs argue that even the portions of the Loss that *did* involve mold are covered because, in those portions, water caused damage before mold did.  That is, according to Plaintiffs, the Mold Exclusion does not apply, full stop, because they

---

[7]  When Steve came upon the Loss, he described the Property as a "hot house" and a "greenhouse."  Steve's EUO, Doc. No. 44-8, at 76:13–14.

"are not seeking coverage for mold . . . remediation but, rather, are seeking recovery of a loss due to water damage."  Pl.'s Opp'n, Doc. No. 53, at 15.  The Plaintiffs believe that—even if no mold had grown—water damage alone required that the Property be "stripped to the studs."  *Id.* The only cost attributable to mold alone, Plaintiffs argue, was Maguire's use of special protective gear during his demolition of the Property's interior;[8] Plaintiffs do not seek to recover that amount.  *See id.*  The Plaintiffs conclude:  "The fact that water damage occurred, which is a covered loss under the Policy, should not be negated by the subsequent development of mold." *Id.* at 16.

The Plaintiffs' argument is off the mark because the plain meaning of the Mold Exclusion forecloses it:  No matter how it comes about, damage involving mold in any way is uncovered. Thus, the parties' arguments do not advance the ball.  The question remains:  What portions of the Loss, if any, did not involve mold in any way?  That inquiry is complicated because neither party has submitted a clear floor plan—or room-by-room analysis—of the Property.[9]  On March 16, 2016, Steve took five photographs[10] of the Loss to share with Rollinson.  Those photographs put beyond any doubt that the Loss in the Property's kitchen involved mold.  *See* Steve's Photos, Ex. E to Badders Aff. ("Steve's Photos"), Doc. No. 44-30, at 4–6.  Another of Steve's photographs depicts mold in a different room, but it is not clear which room.  *See id.* at 3.  On March 18, Rollinson inspected the Property and took 38 photographs.  Those photographs

---

[8]  Maguire's expert report explained that "[i]f the only damage was water/excessive humidity, the demolition cost would be lessened" by about $12,000, but reconstruction would cost about the same amount—"between $244,800 and $326,400" (between $150 and $200 per square foot)—whether or not there had been mold.  *See* Maguire Report, Doc. No. 44-14, at 6.

[9]  Closest is an attachment to the Plaintiff's damages analysis, which indicates that the Property has:  a living area of 1,632 square feet, one story, six rooms, three bedrooms, two full bathrooms, and one half bathroom.  *See* Damages Analysis, Ex. V to Def.'s Mot. for Summ. J., Doc. No. 44-23, at 6.

[10]  Steve apparently took many more photographs of the Loss, but those photographs are not part of the record in this case.  *See* Steve's EUO, Doc. No. 44-8, at 80:24–81:23.

indicate that the following areas contained extensive mold damage:  (1) main level hallway,[11] (2) kitchen,[12] (3) living room,[13] (4) master bedroom,[14] (5) master bedroom closet,[15] (6) one spare bedroom,[16] and (7) one bathroom.[17]  *See* Rollinson Report, Doc. No. 44-31, at 6–13.  Rollinson also photographed an "office," but the photograph does not clearly depict any mold.  *See id.* at 9 (image no. 30).  Images of an unfinished basement, storage room, and garage also do not clearly depict mold.  *See id.* at 10 (image nos. 33–38).

On May 16, 2016—two months after Steve discovered the Loss—Mierzwa inspected the Property and took numerous photographs, 31 of which Mierzwa included in his report.  Mierzwa noted as follows:

> Within the upstairs (main floor), nearly all of the wall and ceiling finishes were damaged from organic mold/algae growth.  Damages were observed [in] the kitchen, bathrooms, bedroom areas, closets, and hallways.  The seasonal room and one storage room above the garage (apparently closed/sectioned off by a door) generally depicted minimal damages to the finishes.

Mierzwa Report, Doc. No. 44-43, at 13.  Mierzwa's photographs confirm extensive mold damage in the (1) living room,[18] (2) master bedroom,[19] (3) kitchen,[20] and (4) main level hallway.[21]  *See id.* at 13–17.  Mierzwa's photographs further depict extensive mold damage in (1) one spare bedroom,[22] and (2) one closet.[23]  *See id.* at 14–15.  Mierzwa also noted that the

---

[11]  Rollinson Report, Doc. No. 44-31, at 7–8 (image nos. 12 and 17).
[12]  Rollinson Report, Doc. No. 44-31, at 7 (image no. 13).
[13]  Rollinson Report, Doc. No. 44-31, at 7 (image no. 16).
[14]  Rollinson Report, Doc. No. 44-31, at 8 (image no. 20).
[15]  Rollinson Report, Doc. No. 44-31, at 8–9 (image nos. 24–26).
[16]  Rollinson Report, Doc. No. 44-31, at 9 (image no. 28).
[17]  Rollinson Report, Doc. No. 44-31, at 8 (image no. 19).
[18]  Mierzwa Report, Doc. No. 44-43, at 13 (photo 17).
[19]  Mierzwa Report, Doc. No. 44-43, at 13 (photo 18).
[20]  Mierzwa Report, Doc. No. 44-43, at 14 (photo 19).
[21]  Mierzwa Report, Doc. No. 44-43, at 16–17 (photos 24–26).
[22]  Mierzwa Report, Doc. No. 44-43, at 15 (photo 21).  It is not clear, though, that this is the same spare bedroom that Rollinson photographed.  *See* Rollinson Report, Doc. No. 44-31, at 9 (image no. 28).
[23]  Mierzwa Report, Doc. No. 44-43, at 14 (photo 20).  Again, it is not clear that this is the same closet that Rollinson photographed.  *See* Rollinson Report, Doc. No. 44-31, at 8–9 (image nos. 24–26).

basement area had "a foul odor indicative of organic mold/algae growth" and that "[o]rganic growth was observed in other portions . . . within the basement area." *Id.* at 6; *see also* Mierzwa Aff., Doc. No. 46, at ¶ 18q. On the other hand, Mierzwa's photographs of the (1) seasonal room, (2) storage area above the garage, and (3) crawl area through the master bedroom do not clearly depict mold. *See* Mierzwa Report, Doc. No. 44-43, at 15–16 (image nos. 22, 23, and 27). In addition, Mierzwa noted that the garage area, which was "sectioned off from the remainder of the home by a door," "did not depict organic growth on the walls at this time." *Id.* at 6; *see also* Mierzwa Aff., Doc. No. 46, at ¶ 18u.

Maguire's report does not help identify portions of the Loss that involved mold in any way. Maguire's report explains that, upon inspecting the Property in early May 2016, Maguire "observed a house interior essentially covered with microbial growth" and with extensive water damage, such that the "only remedy was to completely gut the interior." Maguire Report, Doc. No. 44-14, at 6. Maguire also testified that "there was visible mold growing all over the house." Maguire Depo., Doc. No. 44-18, at 15:11–12. Maguire's assessment of how his demolition costs would have changed if there had been no mold is not relevant to determining what portions of the Loss involved mold in any way.

The above indicates that every reasonable juror would conclude that the Loss in the following areas involved mold in any way:

- Main level hallway;
- Kitchen;
- Living room;
- Master bedroom;
- Master bedroom closet;
- The spare bedroom(s) photographed by Rollinson and Mierzwa;
- The closet photographed by Mierzwa, if different from the master bedroom closet; and
- The bathroom photographed by Rollinson.

Photographic evidence puts it beyond any doubt that mold was involved with the portions of the Loss in those areas. Further, every reasonable juror would conclude that mold was involved in any way with the Loss in the basement area because Mierzwa reported that in the basement there was a "foul odor indicative of organic mold/algae growth," and that he observed "[o]rganic growth . . . beyond the garage door within the basement area." Mierzwa Report, Doc. No. 44-43, at 6. Although no photographs show extensive mold damage in the basement area, some photographic evidence apparently depicts mold in the basement area. *See, e.g., id.* at 8 (image no. 10 depicting dark spots on the walls). Thus, the Mold Exclusion applies to bar coverage for the Loss in all the above areas. Great Lakes is entitled to summary judgment with respect to those areas.

In contrast, a reasonable juror could conclude that mold was not involved in any way with the Loss in certain other areas of the Property. Those areas are (1) the garage, (2) the storage area above the garage, and (3) the crawl area through the master bedroom. Mierzwa explained that he observed no organic growth in those areas, and the photographs that Mierzwa took apparently confirm that assessment. Finally, the damage to the "office" that Rollinson photographed does not clearly involve mold in any way. Because a reasonable juror could conclude that the Mold Exclusion does not apply to bar coverage for the Loss in those areas, Great Lakes is not entitled to summary judgment with respect to those areas.

D. Speculative Damages

Great Lakes moves for summary judgment on a third ground: that the Plaintiffs have failed to make out a prima facie case for breach of contract because they have alleged only speculative damages. This issue is relevant only to the portions of the Plaintiffs' claim for which coverage is not excluded as a matter of law under the Mold Exclusion. Specifically, those

portions are the:  (1) garage, (2) storage area above the garage, (3) crawl area through the master

bedroom, and (4) "office."

Great Lakes argues that the Plaintiffs' damages are speculative.  The Plaintiffs' damage

demand is based on the cost of rebuilding the Property.  *See* Damage Analysis, Ex. V to Def.'s

Mot. for Summ. J., Doc. No. 44-23, at 2.  The amount—$285,600—derives from Maguire's

estimate that the cost of rebuilding the Property would be $150–200 per square foot.  *See* Def.'s

Mem., Doc. No. 44-24, at 24.  Because the Property was 1,632 square feet, $285,600 is the price

of an expected rebuild at $175 per square foot.  *See* Damage Analysis, Ex. V to Def.'s Mot. for

Summ. J., Doc. No. 44-23, at 2 n.1.  Great Lakes emphasizes that Maguire's estimate was

entirely speculative.  Indeed, Maguire proposed the range in an informal email, *see* Email, Ex. J

to Def.'s Mot. for Summ. J., Doc. No. 44-11, and Maguire testified that that range "was a

ballpark number, very ballpark-ish."  Maguire Depo., Doc. No. 44-18, at 53:10–11.  Further,

Maguire admitted that he based that "ballpark number" not on precise software analysis (which

he sometimes used, *see id.* at 17:19–18:10), but rather as "an approximate range based on jobs of

similar scope and size."  *See id.* at 18:11–14.  To come up with the range, Maguire relied on his

personal observations and pictures.  *See id.* at 58:7–59:1.

Great Lakes argues that two analogous cases indicate that the damages that the Plaintiffs

allege here are too speculative to survive summary judgment.  In *Northeast Builders Supply &*

*Home Ctrs., LLC v. RMM Consulting, LLC, et al.*, the court rejected the defendant's breach of

contract claim because alleged damages were too speculative.  2018 WL 1278291, at *14–16

(Conn. Super. Ct. Feb. 2, 2018).  In particular, defendants sought to recover for a non-

conforming delivery of doors and windows based on an architect's testimony that "was not

founded on any personal experience he had in construction" and who had "not inspect[ed] each

of the claimed defective windows and wasn't certain of the number of windows being claimed as defective." *Id.* at *14.  Great Lakes also points to *Leisure Resort Tech., Inc. v. Trading Cove Assocs.*, in which the Connecticut Supreme Court explained that alleged damages are too speculative when they are predicated on a contingency.  277 Conn. 21, 35 (2006).  In *Leisure Resort*, a partner who sold his ownership interest in a partnership before the partnership executed an unexpectedly lucrative deal was barred from suing the partnership on a fraudulent inducement theory because his claim was predicated on a contingency:  that the deal would be reached at those values.  *See id.* at 36.

Great Lakes argues that the Plaintiffs' claim for damages in this case is (1) just as speculative as the claim in *Northeast Builders* and (2) based on a contingency, like the claim in *Leisure Resort*.  Regarding (1), Great Lakes points out that, like the "expert" in *Northeast Builders*, Maguire made vague calculations based on personal observations several months after the Loss and pictures he took on that visit—not based on any measurements or other expert reports.  *See* Def.'s Mem., Doc. No. 44-24, at 28–29.  Regarding (2), Great Lakes explains that Maguire's estimated rebuilding cost was "contingent on the need to repair or replace all of the livable space in the Property and that the cost of such repair would be comparable to jobs of 'similar scope and size.'"  *See id.* at 30.  Great Lakes argues that only further inspection of the Property could help determine "the actual area" that "required repair," but that such an inspection was now impossible because the Plaintiffs sold the Property in 2017.  *See id.* at 31.

The Plaintiffs disagree.  They believe that their damages are easily ascertainable and arrived at by clear quantitative methods.  Plaintiffs emphasize that they need not "prove their exact damages" at the summary judgment stage and have made a prima facie case through their damage analysis, Maguire's testimony and report, and Steve's testimony.  *See* Pl.'s Opp'n, Doc.

No. 53, at 18.  The Plaintiffs argue first that there is no relevant contingency here, such as in *Leisure Resort*.  For instance, in *Zuiewski v. Vaccaro*, a legal malpractice case, the plaintiff sought to recover the insurance disability payments he would have received had the legal malpractice not occurred.  2012 WL 5860476 (D. Conn. Oct. 31, 2012).  The court found those damages not to be based on any "contingency" and allowed plaintiff to recover.  *Id.* at *9.  The court distinguished *Leisure Resort*, where "the finder of fact would have been required to speculate about how negotiations would have changed if the parties to the transaction had more information."  *Id.*  The Plaintiffs argue that, just as in *Zuiewski*, damages here are based not on contingencies but are simply compensatory damages "under an insurance policy which provides a clear basis for valuation of damages."  Pl.'s Opp'n, Doc. No. 53, at 20.

The Plaintiffs also point to *Starview Ventures v. Acadia Ins. Co.*, in which an insured's claim of damages survived summary judgment when it was based on "estimates from its public adjuster and the contractor who was hired to make the repairs to the property."  2011 WL 1734421, at *6 (Conn. Super. Ct. Apr. 5, 2011).  The court held that the plaintiff's "inability to specify the amounts spent thus far on the repairs to the property does not render the plaintiff's claimed damages 'speculative' and 'problematic' . . . given that the plaintiff has specified the quantitative basis on which it relies."  *Id.* (internal citation omitted).  The Plaintiffs argue that the same goes here:  They "rely predominately upon estimates as a damage calculation" and "have provided a quantitative basis for their damages."  Pl.'s Opp'n, Doc. No. 53, at 21.

Finally, the Plaintiffs reject Great Lakes's argument that there are no damages in this case.[24]  *See id.* at 20.  Although the Plaintiffs did not rebuild the Property, they argue that they

---

[24]  Great Lakes argued that because "the Plaintiffs did not incur any actual costs for the repair" and "rather depend on rough estimates that are not based in fact," the Plaintiffs suffered no damages.  *See* Def.'s Mem., Doc. No. 44-24, at 29, 31 (citing *Northeast Builders*).

were unable to do so without the insurance proceeds to which they were entitled.  In such a situation, courts hold that insurers may still owe replacement costs as damages.  *See Thurston Foods, Inc. v. Wausau Bus. Ins. Co.*, 2017 WL 2174402, at \*9 (D. Conn. May 17, 2017) ("An insurer may have a duty to reimburse an insured prior to rebuilding when the insured does not have the means to rebuild the facility without the insurance proceeds.") (internal citations omitted).  Similarly here, the Plaintiffs argue, they were "not provided the funds for a full renovation of the Property's interior" and so "sold the Property with the interior unfi[ni]shed, at a value far less than what it would have received" otherwise.  Pl.'s Opp'n, Doc. No. 53, at 20–21.

Great Lakes distinguishes *Zuiewski* and *Starview*.  *See* Reply, Doc. No. 60, at 27–30. *Zuiewski* was a legal malpractice case entirely dissimilar to the claim here; the calculation of damages there was simple and quantitative because it merely summed "precise dollar amounts for a precise number of months."  *Zuiewski*, 2012 WL 5860476, at \*9.  Here, Great Lakes argues, the Plaintiffs' demand is cloaked as quantitative but is entirely speculative:  for instance, there was no "itemization of the fixtures and personal property that were damaged . . . the cost of installation, the areas that needed to be renovated or restored, or even a listing of the materials removed from the home in 2016."  Reply, Doc. No. 60, at 28.  And in *Starview*, Great Lakes points out, the insured produced an estimate based on information from a public adjuster and a contractor.  *See Starview*, 2011 WL 1734421, at \*6.  Here, Great Lakes says, the Plaintiffs rely solely on Maguire's "ballpark" estimate generated almost a year after the Loss.  Reply, Doc. No. 60, at 29.  Even worse, the Plaintiffs had ample time to obtain the relevant estimates:  as early as July 2017 the Plaintiffs were aware that Great Lakes intended to deny their claim, and the Plaintiffs did not sell the Property until September 2017.  In the interim, it would have been easy to have had a public adjuster or appraiser inspect the Property.  *See id.* at 30.

The Plaintiffs' prima facie case for damages may be weak, but it is not speculative or subject to a contingency.  A defendant is entitled to summary judgment based on a plaintiff's failure make out a prima facie case for damages only when no reasonable jury could set the amount of damages.  Ultimately, a plaintiff must prove damages "with reasonable certainty," which means that a trier of fact must have a "sufficient basis for estimating their amount in money."  *Am. Diamond Exch., Inc. v. Alpert*, 302 Conn. 494, 510 (2011) (citing *Lawson v. Whitey's Frame Shop*, 241 Conn. 678, 689 (1997)).  "[M]athematical exactitude" is not "a precondition to an award of damages."  *Id.* at 510–11.  Indeed, "damages often are 'not susceptible of exact pecuniary computation,'" but they still "'must be left largely to the sound judgment of the trier.'"  *Conaway v. Prestia*, 191 Conn. 484, 494 (1983) (quoting *Johnson v. Flammia*, 169 Conn. 491, 500 (1975)).  To assert a claim for damages, the evidence must simply afford a "basis for a reasonable estimate" by the trier of fact.  *Paiva v. Vanech Heights Constr. Co.*, 159 Conn. 512, 517 (1970) (upholding jury's verdict).

Although proof of damages "may be difficult" in some cases, that difficulty alone is "insufficient reason for refusing an award."  *Am. Diamond*, 302 Conn. at 510.  In other words, a defendant is not entitled to summary judgment simply because it believes it can attack a plaintiff's claim for damages.  *See, e.g.*, *Sanitary Servs. Corp. v. Greenfield Village Ass'n, Inc.*, 36 Conn. App. 395, 400–01 (1994).  "Evidence is considered speculative when there is no documentation or detail in support of it and when the party relies on subjective opinion."  *Am. Diamond*, 302 Conn. at 511 (citing *Viejas Bank of Kumeyaay Indians v. Lorinsky*, 116 Conn. App. 144, 163 (2009)) (internal quotation marks omitted).  "[T]he quantum of proof required is relaxed in instances involving the wrongful breach of a contract by the defendant" to avoid allowing a party to benefit from its wrongdoing.  *Meadowbrook Ctr., Inc. v. Buchman*, 149

Conn. App. 177, 189 (2014).  Further, a claim for damages is subject to a contingency when it

depends on some future event that may or may not happen.  *See Leisure Resort*, 277 Conn. at

35–36; *Contingency*, BLACK'S LAW DICTIONARY (11th ed. 2019) ("An event that may or may not

occur in the future, a possibility.").

Here, the Plaintiffs' estimation of damages comes from Maguire's "ballpark estimate"

that rebuilding the Property would cost between $150 and $200 per square foot.  Maguire gave

that estimate in an email response on May 10, 2017.  *See* Email, Ex. J to Def.'s Mot. for Summ.

J., Doc. No. 44-11.  Maguire later explained that his estimate was "very ballpark-ish," *see*

Maguire Depo., Doc. No. 44-18, at 53:10–11, and that it was "an approximate range based on

jobs of similar scope and size" in Maguire's many years of work in the Connecticut region, *see*

*id.* at 18:11–19.  Maguire testified that he had been in the business of disaster cleaning and

property reconstruction since 1982.  *See id.* at 5:1–6:5.

Although that is thin proof, it is enough to make out a prima facie case for damages.  The

sum is not based on a contingency, such as in *Leisure Resort*.  Great Lakes simply disagrees

about the amount of damages—it thinks none is owed.  But there is no contingency:  the

Property's interior was demolished.  The question of who should pay for the reconstruction is

separate from whether the Property did, in fact, need reconstruction.  And although Maguire's

estimate is somewhat imprecise—he admits it was "very ballpark-ish"—he did not pull the

number out of thin air.  He explained that it was based on his extensive and relevant experience.

It is true that Maguire could have given a more specific number had he used a computer program

that he often used to estimate rebuilding costs.  It is also true that the Plaintiffs could have done

more—such as hiring a public adjuster or contractor to do a detailed inspection of the Property—

to estimate the cost of rebuilding more precisely.  A jury might count those facts against the

Plaintiffs and reduce their damages accordingly.  But Maguire's estimate is not so imprecise that the Plaintiffs have not adequately alleged damages.  Thus, I **deny** Great Lakes's motion for summary judgment on this ground.

**IV.**    **Conclusion**

For the foregoing reasons, Great Lakes's motion for summary judgment, doc. no. 44, is **granted in substantial part and denied in part**.  In particular, Great Lakes's motion is granted with respect to the portions of the Loss that the Mold Exclusion excludes from coverage, because every reasonable juror would agree that those portions of the Loss involved mold.  Great Lakes's motion is denied with respect to all other portions of the Loss.


So ordered.

Dated at Bridgeport, Connecticut, this 21st day of May 2020.


/s/ STEFAN R. UNDERHILL
Stefan R. Underhill
United States District Judge